J-A26024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DAVID FRANCIS OSWALD, JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DANIELLE DIANE LOUISE OSWALD | : | |
| | : | |
| Appellant | : | No. 601 WDA 2025 |

Appeal from the Order Entered April 10, 2025
In the Court of Common Pleas of Westmoreland County Domestic
Relations at No(s):  No. 19DO02177

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED: January 8, 2026**

Appellant, Danielle Diane Louise Oswald, ("Mother") appeals *pro se* from the April 10, 2025 custody order entered in the Court of Common Pleas of Westmoreland County that, *inter alia*, granted David Francis Oswald, Jr. ("Father") primary physical custody for their minor children K.G.O., born December 2013, and L.E.O., born September 2017.[1]  We affirm.

The record reveals that, on December 16, 2019, Father filed a petition for custody of the couple's three children.  After conducting a custody hearing, the trial court, on May 14, 2020, ordered, *inter alia*, that Mother and Father

---

[1] Originally, the parties shared primary physical custody of the two children, as well as a third child, D.F.O., III, born February 2010, on a 2-2-5, 2-2-5 basis.  Custody Order, 8/28/24, at ¶7.  The April 10, 2025 custody order modified the physical custody arrangement as it applied only to K.G.O. and L.E.O, as discussed more fully *infra*.  Custody Order, 4/10/25, at ¶7.  As there was no change to the shared custody arrangement pertaining to D.F.O., III, Mother does not challenge this aspect of the custody order.

share legal custody of the children and that Mother assume primary physical custody of the children, with Father having partial physical custody, according to a schedule set forth in the trial court order. Custody Order, 5/14/20, at 1-2. The trial court also ordered Mother to undergo a psychiatric evaluation and ordered that Mother and Father use the "Our Family Wizard" website for communication purposes. *Id.* at 2-3.

On September 9, 2020, the trial court appointed Amy Keim, Esquire ("Attorney Keim") to serve as guardian *ad litem* for the children. On February 5, 2021, upon consent of Father and Mother, the trial court entered a revised custody order which ordered, *inter alia*, that Mother and Father share legal and physical custody of the children. Custody Order, 2/5/21, at 1-2. The shared physical custody arrangement was to occur on a "two-week, alternating 3-3, 4-4 schedule" as set forth in the custody order. *Id.* at ¶7.

On May 29, 2024, Father filed a petition for modification of custody, requesting that a hearing be scheduled "due to a significant change in circumstances." Father's Petition for Modification of Custody, 5/29/24, at ¶5. On July 24, 2024, the trial court, upon learning that the prior guardian *ad litem* retired, appointed Dorean Petonic, Esquire ("Attorney Petonic") to serve as the children's guardian *ad litem*. Trial Court Order, 7/24/24. Thereafter, the trial court conducted a hearing on August 20, 2024, pertaining to Father's petition for modification of custody.

On August 28, 2024, the trial court entered a revised custody order that, *inter alia*, maintained the shared legal custody arrangement of the prior

custody order but modified the shared physical custody schedule so that Mother and Father now shared physical custody of the three children on a "2-2-5, 2-2-5 schedule." Custody Order, 8/28/24, at 1-2.

On September 6, 2024, Father filed a *praecipe* for pretrial conference, indicating that the issues to be considered in a custody trial were "time/length/number of visits," "primary residence," and "stability and safety while in Mother's custody." Father's *Praecipe* for Pretrial Conference, 9/6/24. The trial court conducted a custody trial on March 27, 2025. On April 10, 2025, the trial court entered a final custody order in which it ordered Mother and Father share legal custody of the three children and physical custody of D.F.O., III on a "2-2-5, 2-2-5 schedule." Custody Order, 4/10/25, at ¶¶1, 7. The trial court, however, awarded Father primary physical custody of K.G.O. and L.E.O., with Mother having partial physical custody of K.G.O. and L.E.O. "every other weekend from Friday after school (or 4:00 [p.m.]) until Monday after school (or 4 :00 [p.m.])." *Id.* at ¶¶8-9. Thus, the April 10, 2025 custody order reduced Mother's physical custody time with K.G.O. and L.E.O. This appeal followed.[2]

Mother raises *pro se* the following issues for our review:

1.  [Did] the trial court err[] and abuse[] its discretion by reducing [Mother's] physical custody of K.G.O. and L.E.O. to 21.43 percent without finding [Mother] unfit[ but, instead, relied on its] preferences and grant[ed] excessive

---

[2] Mother and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

grandparental access, causing alienation and violating 23 Pa.C.S.[A.] § 5328(a) (**Troxel v. Granville**, 530 U.S. 57 (2000))[?]

2.      [Did] the trial court violate[ Mother's] Fourteenth Amendment due process [rights] by failing to docket the emergency motion (filed [March] 3, 2025) and [the] *omnibus* demand (filed [March] 28, 2025), provide the [Pennsylvania Rule of Appellate Procedure] 1931(d) record list, and deliver transcripts, denying [Mother] a fair hearing (**Mathews v. Eldridge**, 424 U.S. 319 (1976))[?]

3.      [Did] the trial court violate[ Mother's] due process [rights] by providing only a 25-minute notice for the [April] 14, 2025, custody exchange, prejudicing [Mother's] compliance (Pa.R.[Civ.]P. 1915.3-2; **Mullane v. Central Hanover Bank & Trust Co.**, 339 U.S. 306 (1950))[?]

4.      [Did] the trial court violate[ Mother's] First Amendment rights by dismissing the minor children's Catechism practices, slandering [Mother's] Wiccan beliefs, and permitting coached testimony ([March] 27, 2025), [thereby] restricting religious expression and maternal bonds (**Wisconsin v. Yoder**, 406 U.S. 205 (1972))[?]

5.      [Did] the trial court err[] by failing to weigh all 16 custody factors under 23 Pa.C.S.[A] § 5328(a), relying on coached testimony and a minor Christmas Eve incident while ignoring [Mother's] extensive parental involvement, harming the children's best interests (**Hedgepeth v. Whitman**, 595 A.2d 125 (Pa. Super. 1991))[?]

6.      [Did] the trial court err[] by not sanctioning Rachel E. Morocco, [Esquire. ("Attorney Morocco")] for bad-faith litigation, including fraudulent filings ([*i.e.*,] false safety *praecipe*, [September] 6, 2024) and misrepresentation ([March] 27, 2025), [as well as] tainting the custody proceedings (Pa.R.[Civ.P.] 3.3; **Beyers v. Richmond**, 594 A.2d 1176 (Pa. Super. 1993))[?]

7.      [Did] the trial court err[] by overlooking [Attorney Petonic's] neglect as guardian *ad litem*, including absence at trial ([March] 27, 2025) and failure to represent the children's [best] interests (23 Pa.C.S.[A.] § 5334; **Parham v. J.R.**, 442 U.S. 584 (1979))[?]

8.      [Did] the trial court enable[] systemic harm through non-docketing of an emergency motion, *pro se* bias, rejection of mailed filings, and failure to provide timely service of the record list and transcripts, denying [Mother] and her family access to justice (**Monell v. Dep't of Soc. Servs.**, 436 U.S. 658 (1978))[?]

9.      [Did] the trial court's ethical lapses, including tolerating perjury and non-docketing [of certain filings, and] breached impartiality [cause] systemic harm (**Monell v. Dep't of Soc. Servs.**, 436 U.S. 658 (1978))[?]

Mother's Brief at 3-4 (extraneous capitalization omitted).

The totality of Mother's appeal presents a challenge to the April 10, 2025 final custody order.  In that order, the trial court, *inter alia*, awarded Father primary physical custody of K.G.O. and L.E.O. and reduced Mother's physical custody of the two children.  More specifically, the trial court ended shared physical custody of the two children on an equal basis and reduced Mother's physical custody award to "every other weekend from Friday after school (or 4:00 [p.m.]) until Monday after school (or 4:00 [p.m.])."[3]

Our standard and scope of review of a custody order is well-settled.

Our standard of review over a custody order is for a gross abuse of discretion.  Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or

_____

[3] As stated *supra*, Mother challenges the modification of the physical custody arrangement with regard to K.G.O. and L.E.O. because the trial court, in awarding physical custody, reduced Mother's physical custody time with the two children.  Mother's physical custody time concerning D.F.O., III did not change.  As such, we will examine Mother's issues as they relate to K.G.O. and L.E.O.

reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Rogowski v. Kirven*, 291 A.3d 50, 60-61 (Pa. Super. 2023) (citations and brackets omitted; formatting modified). "As with all custody matters, the paramount concern is the best interest of the [children] involved." *Id.* at 61 (citation, original quotation marks, and original brackets omitted).

The version of Section 5328(a) of the Child Custody Act that was in effect at the time of the March 27, 2025 custody hearing stated

In ordering any form of custody, the [trial] court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (effective August 13, 2024, to August 28, 2025).[4]

Here, Mother asserts that the trial court erred in reducing her physical custody time with K.G.O. and L.E.O. "without finding unfitness" but instead relying on "unsubstantiated, coerced, and unrepresented child testimony." Mother's Brief at 9. Mother further argues that the trial court "erred by not recognizing speculative statements [(referring to "a speculative Christmas Eve allegation")] as unsworn falsifications with the intent to mislead." *Id.* at 9, 11. Mother contends that Section 5328 requires the trial court to prioritize "parental fitness" and that her "16-year caregiving record is uncontested." *Id.* at 9 (record citation omitted). Mother also contends that the reduction in

_____

[4] In June 2025, Section 5328(a) of the Child Custody Act was amended with the amendments taking effect August 29, 2025. *See* 2025, June 30, P.L. 18, No. 11, § 1, effective August 29, 2025. The Section 5328(a) amendments included deletion of factors 5, 8 (recodified as factor 2.3(ii)), 9, 10 (incorporated into newly-amended factor 3), and 13 (incorporated into newly-amended factor 2.3). The trial court, in evaluating Father's request to modify the custody order, was required to consider the Section 5328(a) factors that were in effect at the time of the March 27, 2025 custody trial. *C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (stating that, "if the evidentiary proceeding commences on or after the effective date of the [amendments to the Child Custody Act, the revised provisions] apply even if the request or petition for relief was filed prior to the effective date;" the commencement date of the evidentiary hearing determines whether the amendments are applicable).

her physical custody of the two children granted "excessive grandparent access" and resulted in "alienation" between her and the children. *Id.*

The trial court, in analyzing the Section 5328(a) factors, found the following:

1. Which party is more likely to ensure the safety of the child.

   Both parties appear to be equally capable of ensuring the physical safety of the children and[,] therefore[,] this factor is neutral.

2. The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact between the child and another party [] is consistent with the safety needs of the child.

   Father filed a petition for protection from abuse against Mother, and Mother filed a petition for protection from abuse against Father in 2019. [The parties,] through counsel[,] agreed to continue the temporary protection from abuse petitions for a period of six months. No evidentiary hearing occurred on either party's petition. Neither party violated the temporary protection from abuse petition[,] and both petitions were dismissed by the [trial] court on April 27, 2020. No testimony was provided about the factual allegations behind the petitions during the custody trial. The parties no longer reside together so any on[-]going concern for abusive contact is minimal. While it is unclear what actually transpired between the parties [] in 2019[,] and while the [trial] court does not condone any abusive

behavior that may have transpired between the parties, no finding of abuse by either party was ever made.

Father presented concerns over Mother taking the children's personal [cellular telephones]. Mother is directly hindering Father's contact with the children when in Mother's custody. The removal of the [cellular telephones] has become increasingly problematic with Mother's recent behavior and the younger children feeling unsafe when in Mother's custody. It is pertinent that Mother allow for communication between the children and Father.

This factor does not favor either of the parties with respect to the abuse concerns. This factor favors Father in that Father is more likely to encourage and permit on-going contact with Mother.

3.    The parental duties performed by each party on behalf of the child.

Parents exercised equal custodial periods since February [] 2021. Mother and Father have equally performed the parental duties for the children for four years. As such, this factor is neutral.

4.    The need for stability and continuity in the child's education, family life[,] and community life, except if changes are necessary to protect the safety of the child or a party.

All three children are academically on-track and doing well in school. Mother testified that [D.F.O., III] receives speech therapy. The children do not currently participate in extra-curricular activities. Mother reports that she has family members in the area that the children interact with, citing specifically aunts, uncles, and maternal grandparents. Mother did not cite any specific activities in the community that she and the children participate in.

Father testified the children go camping with Father's family during the summer months. The children go to Keystone State Park[, in Pennsylvania,] where paternal grandparents have a camper. The children go fishing and spend time with their cousins. Father also reported that during the summer months, he takes the children to Idlewild Park.

As such, the [trial] court finds that this factor favors Father.

5. The availability of extended family.

Father testified that he currently resides with his parents. Both of Father's parents assist with transporting the children to school when Father is working. Paternal grandparents also help Father with getting the children ready for school. It is clear that paternal grandparent[s] both evidence their willingness to assist Father in caring for the children when needed.

Mother reported that she has family in the area to assist with [] childcare when needed. Mother stated that she doesn't often need help with childcare from family. Mother informed the [trial] court that maternal grandmother can assist with childcare but is currently employed, thus limiting her ability to assist on a regular basis.

This factor is neutral.

6. The child's sibling relationships.

The children that are subject of this custody action have no other siblings [attributable] to Father.

Mother has two other children from another relationship. This factor is neutral.

7. The well-reasoned preference of the child, based on the child's maturity and judgment.

During in[-chambers] interviews with the children, [the trial] court was able to ascertain the preferences of the three children. The children were mature for their ages and demonstrated an understanding of the importance of their testimony to the [trial] court.

[D.F.O., III,] the oldest child, testified first. [He] reported that he is fifteen years of age and is currently in the 9th grade in [school]. The child reported that he is performing well academically and likes his school. When asked what a normal day looks like in both parents' home[s], the child stated that when he is at Father's [house], he plays video games. [D.F.O., III] stated that when he is at Mother's [house] he stays in bed and does chores such as laundry and washing dishes. [D.F.O., III] stated that when he is at Mother's [house] he plays with his younger siblings. The

- 11 -

child reports that the current custody schedule works fine and that he does not want the custody schedule to change.

[K.G.O.] testified that she is in [5th] grade[.] When asked what a typical day in Mother's [house] looks like, she stated that she just sits around the house. When asked what a typical day in Father's [house] looks like, the child stated she plays video games and cleans her room. The child added that during the summer months, when she is at Father['s house], she will go swimming with her cousins.

The child testified about an incident that occurred at Mother's [house] on Christmas Eve [] 2024. The child relayed that Mother flipped over a carpet and drew a symbol on the floor in chalk. Mother lit candles and conducted spells, naming one spell in particular "Dragon Spell." Mother attempted to force the child to repeat spells against Father's attorney. Mother engaged in this behavior for approximately 30 minutes. The child said that she felt "wrong" during the incident. The child communicated that both Mother and Father speak ill of one another. The child stated that she likes attending school in [her present school district].

When asked about her siblings, [K.G.O.] said that she is close with her younger brother[, L.E.O.,] and she gets mad at her younger sisters[, referring to Mother's other two children who are not subject to the current custody dispute.]

The child informed the [trial] court that she wants to live with Father full time and that she is often scared at Mother's [house], further explaining that Mother yells. The child stated that Mother has anger issues, providing an example of the time when Mother became angry and ripped down a bookshelf. The child stated that maternal grandmother comes to visit but she does not see Mother's extended family as often as she sees Father's extended family.

[L.E.O.] is a seven-year-old child who is in the [2nd] grade[. L.E.O.] said he has a best friend [] at school. When at Father's house, [L.E.O.] testified that he plays Minecraft and Roblox on the computer. [L.E.O. likes to play with his older siblings[, referring to D.F.O., III and K.G.O. He] communicated that he does not get along with his younger sister[s, referring to Mother's other two children who are not subject to the current custody dispute,] and that they yell

at him.  When at Mother's [house, L.E.O.] stated he plays outside.  [He] reported that[,] while he likes both houses, he would like to be with Father more.  The child stated that he "kind of" feels safe when at Mother's [house].

[L.E.O.] testified about the incident on Christmas Eve.  [His] recollection of the evening consisted of Mother trying to talk to a ghost.  [L.E.O.] stated that Mother was trying to take down Father and paternal grandparents.

Based upon the children's testimony, this factor is neutral based upon [D.F.O., III's] testimony.  This factor favors Father based upon the testimony provided by [K.G.O. and L.E.O.]

8.    The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall [not] be presumed to be caused by the other party.

Based upon the above noted testimony of the children, the [trial] court has concerns over Mother attempting to turn the children against Father.  Mother held a ceremony with the children evidencing her intent to cast spells on Father and his counsel prior to the custody trial.  No examples were provided to the [trial] court involving Father attempting to turn the children against Mother.

This factor favors Father.

9.    Which party is more likely to maintain a loving, stable, consistent[,] and nurturing relationship with the child adequate for the child's emotional needs.

Both parties are equally likely to maintain a loving, stable, consistent, and nurturing relationship with the children adequate for their emotional needs.  No concerns were presented to the [trial] court that either party's household is unstable.  The children's testimony reflected that household routines are followed regardless of who has physical custody.  No evidence was presented that either

- 13 -

parent fails to maintain a loving and nurturing relationship with the children. No emotional concerns were reported for the children either. Mother testified that the children are not currently enrolled in counseling.

10. Which party is more likely to attend to the daily physical, emotional, developmental, educational[,] and special needs of the child.

Both Mother and Father are equally likely to attend to the daily physical, emotional, developmental, educational[,] and special needs of the children. [The] parties have been sharing physical custody of the children since the [February 5, 2021 custody order.] No physical or developmental issues for any of the children were presented at trial. All children report that they are doing well in school. No special needs for any of the children were mentioned but [D.F.O., III] participates in speech therapy.

11. The proximity of the residences of the parties.

Father lives in Scottdale, Pennsylvania[,] and Mother resides in Greensburg, Pennsylvania. The parties reside close enough that the children can remain in their current school district. This factor is not an issue and requires no further analysis.

12. Each party's availability to care for the child or ability to make appropriate child-care arrangements.

Father testified that when he is working, paternal grandparents and paternal aunt assist with childcare. Mother testified that she is unemployed/self-employed and does not require childcare [assistance] for any of her children. Mother informed the [trial] court that if she needs help with childcare, maternal grandparents are able to assist. Therefore, this is a neutral factor.

13. The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

The level of conflict in this case appeared relatively low until the custody trial was scheduled. The children provided

- 14 -

credible recollection of an incident from Christmas Eve []
2024. Mother cast spells on Father, his family, and Father's
counsel. Mother insisted that the children participate in the
same. It appears as if Mother is creating unnecessary
conflict between the parties. As such, this factor favors
Father.

14. The history of drug or alcohol abuse of a party or member
of a party's household.

No concerns over drugs or alcohol use for the parties to this
action were raised as a matter of concern for the children.
No analysis will be provided under this factor as it is not
applicable.

15. The mental and physical condition of a party or member of
a party's household.

No concerns over the mental or physical condition of Father
were raised during this trial.

Father [] raised concerns over Mother's mental condition.
[On May 14, 2020, the trial court] ordered Mother to
undergo a psychiatric evaluation. It is unclear to the [trial]
court if Mother ever completed this evaluation. No
additional mental health evaluations were ever requested.
It is clear that Mother's recent behavior on Christmas Eve
conjuring spirits and forcing the children to participate
despite their fear [raises a concern] for Mother's current
mental state. Mother's inability[,] at trial[,] to comprehend
certain rulings also called into question her mental state.
This factor favors Father.

16. Any other relevant factor.

Although mentioned above, it bears repeating that Mother
forced the children to participate in witchcraft and/or the
casting of spells. All three children were hesitant to discuss
[this matter] because Mother instructed the children not to
discuss the activity. It is clear that all of the children felt
conflicted in the moment and remained concerned for their
safety after the ceremony. Mother's behavior is troubling
for the effect such behavior could have on children's mental
health. Mother's insistence that the children keep the event
a secret from Father and other adults is not appropriate.
Mother influencing and forcing the children to engage in

situations where they feel unsafe or uncomfortable is not in the best interest of the children. When offered an opportunity[,] at trial[,] to deny or put into context these events, Mother declined.

A second concern is Mother's lack of willingness to participate in additional services for the family. [On November 8, 2024, the trial court ordered] Mother [] to participate in [a] "Family Needs Assessment[.]" At the time of [the custody] trial, Mother had not completed the assessment due to what she claimed were financial barriers.

On cross[-]examination, Father's counsel questioned Mother on her ability to pay for a family trip to Paris, France for [K.G.O.] to participate in activities related to Fashion Week, but Mother could not pay the assessment. Mother responded by informing the [trial] court that she would pay for the trip all over again and does not need an assessment to tell her how to parent her children.

It is clear to [the trial] court that Mother fails to comprehend that the family needs assessment is for the benefit of the entire family and not a criticism over her direct parenting. The assessment is to assist the [trial] court in determining if the children [and] parents need any additional services to support the family through the custody conflict. This is consistent with Mother's failure to understand court rulings and directives during trial.

Another concern is what appears to be the heavy influence on the children by Father [and] his family. It was clear that [K.G.O.], specifically, has been "coached" with respect to her testimony. The minor child entered the in-[chambers] interview with a diary that contained sticky tabs, directing the child to specific diary entries that she wanted the [trial] court to read. [K.G.O.] also informed the [trial] court that Father talks about the custody case with her. Of additional concern was the counseling of the children[, both K.G.O. and L.E.O.,] prior to and after their testimony. [K.G.O.] was asked[,] "Do you have your notebook and letters" by a family member. Paternal grandmother engaged [K.G.O. and L.E.O.] in a hovering behavior immediately after the conclusion of their testimony.

Trial Court Opinion, 4/10/25, at 5-15 (emphasis and extraneous capitalization omitted).[5]

The record demonstrates, as set forth *supra*, that the trial court based its custody decision on a consideration of the 16 factors set forth in Section 5328(a). In considering these factors, the trial court found that 11 of the factors, including the four factors that the trial court was required to give substantial weighted consideration (Factors 1, 2, 2.1, and 2.2), were neutral as to both Mother and Father. The trial court found that the factor related to drug and alcohol abuse (Factor 14) was non-applicable, and we agree. The trial court found that five factors (Factors 2.3, 4, 8, 13, and 15) favored Father. The trial court found that Factor 7 - preference of the children was neutral as to D.F.O., III and favored Father as to K.G.O. and L.E.O. Finally, the trial court considered as "other relevant factors" the circumstances surrounding Mother's use of spell casting with the children, Mother's refusal to participate in a court-ordered assessment, and Father's "heavy influence" over the children. The trial court, ultimately, determined that consideration of the Section 5328(a) factors favored a physical custody arrangement that, *inter alia*, reduced Mother's physical custody time with K.G.O. and L.E.O.

During individual in-chambers interviews conducted by the trial court, without the presence of parties or counsel, K.G.O. and L.E.O. expressed a

---

[5] For ease of reference, we have assigned page numbers to the trial court's unpaginated April 10, 2025 opinion.

desire to live with Father full-time.[6]  N.T., 3/27/25, at 93, 101.  K.G.O. stated that she wanted to stay with Father full-time because she became "scared" when Mother "yelled."  *Id.* at 93.  K.G.O. also stated that Mother has "anger issues" sometimes and described, by way of example, an incident that occurred on Thanksgiving Day in which Mother "ripped down" a bookcase and broke it.  *Id.* at 92.  L.E.O. stated that he wanted to stay with Father because he was "better" but L.E.O. could not articulate what, exactly, made Father "better."  *Id.* at 101.  L.E.O. stated that he felt safe when he was with Father and "kinda" safe when he was with Mother.  *Id.* at 103.  Both children spoke about an incident that occurred on Christmas Eve 2024, in which Mother involved the three children in what K.G.O. described as witchcraft or doing spells and what L.E.O. described as Mother trying to talk with ghosts and "take down" Father and paternal grandparents.  *Id.* at 91, 101-102.  K.G.O. described the purpose of the spell casting as an attempt by Mother "to kill" Father's attorney and K.G.O. stated that participating in the activity felt "just really wrong."  *Id.* at 91, 95.  K.G.O. stated that Father talked about the "court thingy" with them and Mother talked about the custody case with them, said mean things, and called Father names.  *Id.* at 92-93.

---

[6] During his in-chambers interview, D.F.O., III stated that he wanted to maintain the current physical custody arrangement (shared 50/50 physical custody) as it related to him.  N.T., 3/27/25, at 87.  D.F.O., III also stated that he "supports" Mother.  *Id.* at 88.

Father testified that K.G.O. and L.E.O. expressed to him that they do not feel safe with Mother and wished to live with Father. *Id.* at 17, 21. Father stated that he was concerned about, *inter alia,* Mother's mental health and the lack of food and other supplies for the benefit of the children at Mother's house. *Id.* at 21-15, 37. Paternal grandmother explained that, in her opinion, the children loved Mother but they become stressed over Mother's behavior. *Id.* at 45. Paternal grandmother also described an incident with Mother that occurred during a custody exchange on New Year's Day. Paternal grandmother stated that Mother accused paternal grandmother of wanting full-time custody of the children and trying to take the children away from Mother. *Id.* at 57. Paternal grandmother stated that Mother called her "a religious piece of shit over and over" in front of the children. *Id.*

Mother testified that she did not participate in the court-ordered family assessment due to a lack of money. *Id.* at 73. On cross-examination, however, Mother acknowledged that she spent money traveling with K.G.O. to Paris, France and stated that she would rather spend the money on travel than on an assessment because the assessment was not necessary. *Id.* at 81-82. Mother, when asked by the trial court, refused to explain the incidents that occurred on Thanksgiving Day, Christmas Eve, or New Year's Day. *Id.* at 74.

Upon review, the trial court's consideration of the Section 5328(a) factors, as well as its custody decision, is supported by the record. As such, we discern no abuse of discretion or error of law in the trial court's custody

order that modified the physical custody arrangement involving K.G.O. and L.E.O. As with all custody matters, the trial court's primary focus was on the best interests of the children. Here, the trial court expressed concern for the children's safety when they are with Mother based upon the statements made by K.G.O. and L.E.O., as well as the Christmas Eve incident in which Mother attempted to "cast spells" on Father, his parents, and Father's attorney due to Mother's animosity towards these individuals. In undertaking these actions, Mother directly involved the children in what was described a "take down" of Father or an attempt "to kill" Father's attorney. This type of behavior, for which Mother offered no explanation when given the opportunity by the trial court, supports the trial court's finding that certain factors, namely Factors 2.3, 4, 8, 13, and 15, favor Father. Due to Mother's behavior, K.G.O. and L.E.O. both expressed a desire to live with Father. As such, the record supports the trial court's custody order that reduced Mother's physical custody time with K.G.O. and L.E.O.[7]

Within the context of Mother's challenge to the April 10, 2025 custody order, Mother raises the assertion that the trial court, in rendering its decision,

---

[7] We reject Mother's assertion that the trial court, in reaching its decision, relied on "unsubstantiated," "coerced," or "speculative" statements and testimony by the children. Instead, we view Mother's assertion as an attempt to have this Court reassess the credibility of the witnesses and reweigh the evidence in the hope that we reach a different result. As discussed *supra*, with regard to issues of credibility and weight of the evidence, we defer to the trial court who viewed and assessed the witnesses first-hand. As such, we decline Mother's request to reweigh the evidence or reevaluate the credibility of the witnesses.

violated her due process rights. **See** Mother's Brief at 10 (stating, "due process requires notice 'reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and allow them to present their objections'"). It is well-established that "[f]ormal notice and an opportunity to be heard are fundamental components of due process when a person may be deprived in a legal proceeding of a liberty interest, such as physical freedom, or a **parent's custody of her [or his] child**." **Everett v. Parker**, 889 A.2d 578, 580 (Pa. Super. 2005) (emphasis added). As Mother's concerns relate to her appeal of the April 10, 2025 custody order, we find no violation of Mother's due process rights.[8] Mother received formal notice of the March 27, 2025 custody hearing, represented herself *pro se* at the custody hearing, and was offered the opportunity, by the trial court, to present argument in support of her position, testimony, and evidence.[9] N.T., 3/27/25, at 60-85. To the extent that Mother asserts the trial court violated her due process rights because it failed to entertain her request for summary judgment, we find Mother's understanding of the law, as it pertains to custody

---

[8] "A question regarding whether a due process violation occurred is a question of law for which [our] standard of review is *de novo* and the scope of review is plenary." **S.T. v. R.W.**, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

[9] Mother did not challenge the adequacy of the notice of the custody hearing at the start of the custody hearing before the trial court. N.T., 3/27/25, at 3.

matters, to be misplaced. Summary judgment is a procedural mechanism by which cases may be resolved without a trial

> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.Civ.P. 1035.2. A request for summary judgment, as explained by the trial court, is not appropriate in a custody matter, as the parties are required to build a record to allow the trial court to adequately consider the factors set forth in Section 5328(a) and weigh the evidence and assess the credibility of the witnesses in reaching its conclusion regarding what custody arrangement is in the best interest of the child. **See generally**, N.T., 3/27/25, at 60-72. As such, there is always a factual determination that must be made by the trial court that prevents the trial court from entertaining a motion for summary judgment in a custody matter.

Mother further asserts that the trial court violated her First Amendment Right to freedom of religion when it "dismiss[ed] the children's religious freedoms in Catechism and slander[ed Mother's] spirituality." Mother's Brief at 11. Mother contends that 42 Pa.C.S.A. § 5902(b) prohibits the trial court from questioning her religious beliefs in a judicial proceeding. **Id.** We find no support in the record for Mother's assertions.

Section 5902 of the Judicial Code, in pertinent part, states

**(b) Religious belief may not be shown. -** No witness shall be questioned, in any judicial proceeding, concerning his [or her] religious belief; nor shall any evidence be heard upon the subject, for the purpose of affecting either his [or her] competency or credibility.

42 Pa.C.S.A. § 5902(b).

The notes of testimony demonstrate that, as part of the custody hearing, the trial court became aware of, and was concerned about, an incident that occurred on Christmas Eve 2024. N.T., 3/27/25, at 17-20, 91, 95, 97, and 101-103; *see also* Father's Exhibit 1. Mother fails to point to a specific instance where the trial court expressed an opinion as to Mother's beliefs for purpose of evaluating her credibility or competency. *See* Mother's Brief at 11. Instead, the Christmas Eve incident was evaluated by the trial court in determining the best interest of the children, namely whether, or not, Mother's behavior made the children feel unsafe or uncomfortable while with Mother. Trial Court Opinion, 4/10/25, at 9-10, 12-13. Specifically, the trial court stated that Mother's behavior on Christmas Eve 2024 was "troubling for the effect such behavior could have on [the] children's mental health." *Id.* at 13. The trial court provided Mother an opportunity to explain the incident but Mother declined. N.T., 3/27/25, at 74 (the trial court asking, "Did you want to offer testimony regarding the Christmas Eve incident that there was testimony about?", to which Mother replied, "I do not."). As such, we find

Mother's assertion that the trial court violated Section 5902(b), as well as her First Amendment right to freedom of religion, to be unsupported by the record.

Mother also claims the guardian *ad litem* was not present at the March 27, 2025 custody hearing in violation of Section 5334 of the Child Custody Act. Mother's Brief at 12. Mother contends that "[t]he failure to appear at [the custody] trial violated the [guardian *ad litem*'s] duties to participate in all proceedings and advocate for the children[] and undermined the [trial c]ourt's ability to apply the [Section 5328 factors]." ***Id.***

Section 5334(a) states that a trial court "**may** on its own motion or the motion of a party appoint a guardian *ad litem* to represent" the children in a child custody matter. 23 Pa.C.S.A. § 5334(a) (emphasis added). Section 5334(a) does not, however, require the trial court to appoint a guardian *ad litem*. If a guardian *ad litem* is appointed, then the guardian *ad litem* is charged with representing the best interest of the children. 23 Pa.C.S.A. § 5334(b). Although one of the guardian *ad litem*'s duties enumerated in Section 5334(b) is to "[p]articipate in all proceedings," Rule 1915.25 of the Pennsylvania Rules of Civil Procedure suspended certain aspects of Section 5334, including suspension of a guardian *ad litem*'s ability to "examine, cross-examine, present witnesses, and present evidence on behalf of the child," as well as the ability to testify. Pa.R.Civ.P. 1915.25(b).

Here, without objection from either party, the trial court, in addressing whether, or not, the guardian *ad litem* would be present at the March 27, 2025 custody trial, explained that the guardian *ad litem* was "standing by her

report[.]"[10]  N.T., 3/27/25, at 5.  After conclusion of the custody hearing, the trial court carefully considered all of the Section 5328 factors and based its decision to modify the physical custody arrangement as it related to K.G.O. and L.E.O on the competent evidence and testimony presented at the custody trial.  As discussed *supra*, we discern no error in, and the record supports, the trial court's consideration of the Section 5328 factors.  Therefore, we will not disturb its decision.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/08/2026

---

[10] Although the trial court referred to the guardian *ad litem*'s report during the custody hearing, the report does not appear to have been filed with the trial court and is not part of the certified record presently before us.  In a letter directed to this Court, the guardian *ad litem* indicated that because she no longer serves as the guardian *ad litem* in this matter, she would not be filing an advocate's brief.  Letter, 8/29/25.  The guardian *ad litem* attached a copy of her report to the letter filed with this Court.  **Id.**  The guardian *ad litem* also expressed the contents of her report to the trial court during a pretrial conference held on November 7, 2024.  **See generally,** N.T., 11/7/24.